Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIE YUAN, derivatively on behalf of NOVA LIFESTYLE CORP., <br><br> Plaintiff, <br><br> v. <br><br> THANH H. LAM, JEFFERY CHUANG, YUEN CHING HO, CHARLIE HUY LA, BIN LIU, STEVEN QIANG LIU, UMESH PATEL, MIN SU, and YA MING WONG, <br><br> Defendants, <br><br> and <br><br> NOVA LIFESTYLE, INC., <br><br> Nominal Defendant. | Case No.: |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## JURY DEMANDED

## **INTRODUCTION**

Plaintiff Jie Yuan ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Nova LifeStyle, Inc. ("Nova LifeStyle" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Thanh H. Lam, Jeffery Chuang, Yuen Ching Ho, Charlie Huy La, Bin Liu, Steven Qiang Liu, Umesh Patel, Min Su, and Ya Ming Wong (collectively, the "Individual Defendants," and together with Nova LifeStyle, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors and/or officers of Nova LifeStyle, unjust enrichment, waste of corporate assets, and violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, he alleges the following based upon personal knowledge as to his and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Nova LifeStyle, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Nova LifeStyle's directors, officers, and controlling shareholder from at least December 3, 2015 through the present (the "Relevant Period").

2.     Nova LifeStyle is a U.S.-based designer, manufacturer, and distributor of modern furniture for commercial and residential usages. The Company promotes its products through retail channels and online platforms where they can be purchased wholesale.

3.     Nova LifeStyle markets its products through several Company brands including Diamond Sofa, Colorful World, Giorgio Mobili, and Bright Swallow, and functions through several wholly-owned subsidiaries. The Company's customers comprise of distributors, retailers, and designers located worldwide, including in the United States, Canada, the Middle East, and China.

4.     During the Relevant Period, the Individual Defendants made and/or caused the Company to make false and misleading statements indicating that the Company was entering into a strategic alliance with Shanxi Wanqing Senior Care Service Group ("Shanxi Wanqing"), a purported senior care service, home, and hotel development company in China. Under the alliance, Nova Lifestyle would serve as the exclusive furniture designer and manufacturer for a purported $460 million senior care center (the "Shanxi Wanqing Project"). The Company claimed that the alliance was "critical to increase [the Company's] exposure in new markets . . . and generate significant long-term revenue opportunities for the Company."

5.      The Individual Defendants further made and/or caused the Company to make false and misleading statements that inflated customer sales resulting from the Shanxi Wanqing Project and other companies in 2016 and 2017.

6.      On December 21, 2018, a report by Andri Capital on Seeking Alpha revealed overstatements of revenue reported by the Company from at least 2016 and 2017. The report disclosed evidence of the Company engaging in suspicious activities such as booking fictitious sales with companies that had been dissolved or that did not exist. Specifically, the report stated that Shanxi Wanqing was possibly a sham company and that the Company's announcements regarding the development project were intended to deceive investors.

7.      On this news, the price per share of Nova LifeStyle stock plummeted over 40% from the previous day's closing price dropping $0.31 to close at $0.46 on December 21, 2018.

8.      On January 22, 2019, the Company filed a current report with the SEC on Form 8-K stating that it had received notice from NASDAQ that the closing bid for the Company's common stock no longer complied with the minimum requirements for listing and as such, the Company's shares would be delisted unless the Company regained compliance within a specified period of time.

9.      The notice indicated that if the Company's shares were to trade at or above the minimum bid requirement ($1.00 per share) within 180 days of receiving the notice, for at least 10 consecutive days, the stock could regain compliance.

Verified Shareholder Derivative Complaint

10.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company exaggerated the truth and benefits of the supposed Shanxi Wanginq Project; (2) the Company reported inflated sales associated with Shanxi Wanginq and other companies in 2016 and 2017, and; (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

11.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

12.     Furthermore, during the Relevant Period, four of the Individual Defendants breached their fiduciary duties by engaging in insider sales, netting proceeds of over $16.5 million.

13.     In light of the Individual Defendants' misconduct, which has subjected Nova LifeStyle, its current and former Chief Executive Officer ("CEO"), and its current and former Chief Financial Officer ("CFO"), to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the

Central District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

14. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the current and former CEOs' and CFOs' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Nova LifeStyle's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

16. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

21.     Venue is proper in this District because Nova LifeStyle and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

### PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of Nova LifeStyle common stock. Plaintiff has continuously held Nova LifeStyle common stock at all relevant times.

### Nominal Defendant Nova LifeStyle

23.     Nova LifeStyle is a Nevada corporation with its principal executive offices at 6565 E. Washington Blvd., Commerce, California, 90040. Nova LifeStyle's shares trade on the NASDAQ Global Market ("NASDAQ-GM") under the ticker symbol "NVFY."

**Defendant Lam**

24.     Defendant Thanh H. Lam ("Lam") has served as a director and as the Company's President since June 2011. Defendant Lam has also served as Chairman of the Board since June 2013. Lam was appointed interim CEO of the Company in October 2016 and has served as the Company's CEO since April 2017. According to the Company's Schedule 14A filed with the SEC on April 9, 2018 (the "2018 Proxy Statement"), as of April 5, 2018, Defendant Lam beneficially owned 396,403 shares of the Company's common stock, which represented 1.44% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 5, 2018 was $1.68, Defendant Lam owned approximately $665,957 worth of Nova LifeStyle stock.

25.     For the fiscal year ended December 31, 2017, Defendant Lam received $141,228 in compensation from the Company. This included $100,000 in salary, and $41,228 in option awards.

26.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme

was exposed, Defendant Lam made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| November 28, 2016 | 41,770 | $ 2.95 | $ 123,221 |
| November 29, 2016 | 8,230 | $ 2.95 | $ 24,278 |

Thus, in total, before the fraud was exposed, she sold 50,000 Company shares on inside information, for which she received approximately $147,499. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

27. In addition, beginning in September 2011, a Company subsidiary, Diamond Bar, leased a showroom in High Point, North Carolina from Defendant Lam. The lease is renewed every year. During the fiscal years ended December 31, 2016 and December 31, 2017, Nova LifeStyle paid $65,832 total in rental payments to Defendant Lam, $32,916 each respective year.

28. The Company's 2018 Proxy Statement stated the following about Defendant Lam:

**Thanh H. Lam**[1] was appointed our President and a member of our Board on June 30, 2011, and was elected as Chairperson of the Board on June 4, 2013. Ms. Lam was appointed as our Interim Chief Executive Officer on October 7, 2016, and as our Chief Executive Officer on April 10, 2017. Ms. Lam was a co-founder of the Diamond Sofa brand and previously was the Chief Executive Officer of Diamond Bar in Commerce, California, our wholly-

---

[1] Emphasis in original unless otherwise noted in this Complaint.

owned subsidiary acquired by the Company in August 2011. Ms. Lam has pioneered the Diamond Sofa brand since 1992 and, prior to our acquisition of the Diamond Sofa brand, was in charge of its product development and merchandising for the U.S. market and managed its national sales force and oversaw distribution. In 2005, Ms. Lam was featured in a Furniture Today "Fresh Faces" profile, one of the highest honors bestowed to exceptional and talented young entrepreneurs in the furniture industry. Ms. Lam received her Bachelor of Science degree in Business Administration and Finance from the California State University of Los Angeles. Ms. Lam brings to the Board many years of experience in developing a furniture brand and marketing to the U.S. furniture industry. The Board believes that Ms. Lam's in-depth knowledge of the U.S. furniture market and knowledge of our business through her work with the Diamond Sofa brand will assist us in our future growth and expansion plans.

29.    Upon information and belief, Defendant Lam is a citizen of the State of California.

**Defendant Chuang**

30.    Defendant Jeffery Chuang ("Chuang") has served as Nova LifeStyle's CFO since August 2017. According to the 2018 Proxy Statement, as of April 5, 2018, Defendant Chuang beneficially owned 35,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2018 was $1.68, Defendant Chuang owned approximately $58,800 worth of Nova LifeStyle stock.

31.    For the fiscal year ended December 31, 2017, Defendant Chuang received $64,439 in compensation from the Company. This included $50,000 in salary and $14,439 in option awards.

32.     The Company's 2018 Proxy Statement stated the following about Defendant Chuang:

> **Jeffery Chuang** was appointed as our Chief Financial Officer on August 22, 2017.  Prior to joining the Company, Mr. Chuang served as the managing partner of Z & C CPAs, LLP from June, 2011 to August, 2017.  Mr. Chuang received his Bachelor of Science in Finance from California State University, Northridge in 1997 and his Master of Science in Taxation from Golden Gate University in 2006. Mr. Chuang is a Certified Public Accountant and is a member of California Society of Certified Public Accountants.

33.     Upon information and belief, Defendant Chuang is a citizen of the State of California.

**Defendant Ho**

34.     Defendant Yuen Ching Ho ("Ho") served as a Company director from May 2013 until his resignation in August 2017. He also served as the Company's CFO from June 2011 until his resignation in August 2017. According to the Company's Schedule 14A filed with the SEC on April 20, 2017 (the "2017 Proxy Statement"), as of April 11, 2017, Defendant Ho beneficially owned 4,156,403 shares of the Company's common stock, which represented 15.4% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 11, 2017 was $1.82, Defendant Ho owned approximately $7.5 million worth of Nova LifeStyle stock.

Verified Shareholder Derivative Complaint

35.     For the fiscal year ended December 31, 2016, Defendant Ho received $200,000 in compensation from the Company. This included $80,000 in salary and $120,000 in stock awards.

36.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Ho made the following sale of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| June 19, 2017 | 4,156,403 | $   1.41 | $   5,860,528 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

37.     The Company's 2017 Proxy Statement stated the following about Defendant Ho:

**Yuen Ching Ho** was appointed our Chief Financial Officer on June 30, 2011 and as a member of our Board on May 28, 2013. Mr. Ho was one of the two founders of Nova Dongguan, our former wholly-owned subsidiary and served as its Chief Financial Officer from its inception in 2003 until October 2016. Mr. Ho has also been responsible for the administration, finance and marketing of Nova Macao, our wholly-owned subsidiary, since its inception in 2006. Mr. Ho has over 20 years of experience in the furniture industry. From 1991 to 2003, Mr. Ho served as the Chief Operating Officer of Navy Blue Inc., a Macao-based furniture company with manufacturing facilities in Dongguan, China. From 1990 to 1991, Mr. Ho worked as the export administrative staff for C&E German Furniture Ltd., a Hong Kong-based furniture company with manufacturing facilities in Dongguan, China. Mr. Ho received a bachelor's degree in Commerce from St. Mary's University in 1984 and obtained his MBA from The Chinese University of Hong Kong in 1990.  Mr. Ho has been selected as a nominee for director due

to his service as our Chief Financial Officer, his extensive knowledge of financial accounting, corporate finance and all financial facets of our Company, and his management experience prior to joining the Company.

38.    Upon information and belief, Defendant Ho is a citizen of the People's Republic of China.

**Defendant La**

39.    Defendant Charlie Huy La ("La") has served as a Company director since January 2017. He also serves as a member of the Compensation Committee, Audit Committee, and Nominating and Corporate Governance Committee. According to the 2018 Proxy Statement, as of April 5, 2018, Defendant La beneficially owned 87,116 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2018 was $1.68, Defendant La owned approximately $146,354 worth of Nova LifeStyle stock.

40.    For the fiscal year ended December 31, 2017, Defendant La received $98,330 in compensation from the Company. This included $24,179 in fees earned or cash paid, $20,051 in stock awards, and 54,151 in option awards.

41.    The Company's 2018 Proxy Statement stated the following about Defendant La:

**Charlie Huy La** was appointed a member of the Board on January 24, 2017. Since May 2015, Mr. La has served as a managing member of Grand Pinnacle Investment LLC, an investment company specializing in real estate investment and management. Mr. La has also served since November 2008 as the human resource information system lead at Reliance Steel and Aluminum Co., a Fortune 500 company and the largest metals service center in North America. Mr. La holds a bachelor degree in management

information systems from La Salle University, which he received in July 1999. The Board believes that Mr. La's expertise and knowledge of investment, management, human resource systems and payroll operation will benefit the Company's operations and make him a valuable member of the Board and its committees.

42.     Upon information and belief, Defendant La is a citizen of the State of California.

**Defendant Liu**

43.     Defendant Bin Liu ("Liu") has served as a Company director since May 2015. He also serves as a member of the Compensation Committee, Audit Committee, and Nominating and Corporate Governance Committee. According to the 2018 Proxy Statement, as of April 5, 2018, Defendant Liu beneficially owned 121,629 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2018 was $1.68, Defendant Liu owned approximately $204,336 worth of Nova LifeStyle stock.

44.     For the fiscal year ended December 31, 2017, Defendant Liu received $101,421 in compensation from the Company. This included $27,270 in fees earned or cash paid, $20,000 in stock awards, and 54,151 in option awards.

45.     The Company's 2018 Proxy Statement stated the following about Defendant Liu:

**Bin Liu** was appointed a member of our Board on May 19, 2015.  Mr. Liu has been the Chief Financial Officer of Kingold Jewelry Inc. – a NASDAQ listed company ("Kingold") since April 2010. Mr. Liu's duties at Kingold include full responsibility for all of Kingold's public financial reporting

requirements. Mr. Liu has extensive experience and knowledge with US GAAP and SOX. Under his management, Kingold has filed all annual and periodic reports in a timely manner. Mr. Liu also played a critical role in building and strengthening Kingold's internal control system. Mr. Liu also has substantial responsibility and experience in dealing with investor relationships and capital markets. From July 2004 through March 2010, Mr. Liu served as a vice president of Citigroup's Financial Institution Cards business where he had full financial responsibility of a $2 billion business. He has also played critical roles in the development of Citigroup's franchise development in the US. From 1993 through 2002, Mr. Liu worked for China's Ministry of Commerce (MOFCOM), promoting bilateral business and investment between the US and China. Mr. Liu graduated from the Kellogg School at Northwestern University with a Master of Business Administration in 2004 and also received his undergraduate degree from the Shanghai Institute of Foreign Trade. Mr. Liu has been selected as a nominee for director because he has extensive experience and knowledge of financial accounting and corporate finance for publicly traded companies as well as experience with regulatory agencies in China.

46.    Upon information and belief, Defendant Liu is a citizen of the People's Republic of China.

**Defendant Qiang**

47.    Defendant Steven Qiang Liu ("Qiang") has served as the Company's Vice President since January 2017. Defendant Qiang also owns 100% equity interest in St. Joyal, a California-based corporation which specializes in business management and development. St. Joyal has been involved with the Company since its inception in 2011 through investing and introducing the Company to customers. In January 2011, the Company entered into the St. Joyal Shareholder Agreement (the "Agreement") with St. Joyal which provided that St. Joyal pay $2.4 million to the Company by January 1, 2014 in order to obtain an 18.75% interest in the Company's common stock. The balance was

paid in full by April 2014.[2] The Agreement also provided for St. Joyal to assist the Company in its expansion efforts in the United States through continued customer introductions and advise the Company on sales and business matters. The Company continues to work with St. Joyal in an effort to expand its direct sales and marketing efforts in the United States.[3]

48.    According to the 2018 Proxy Statement, as of April 5, 2018, Defendant Qiang beneficially owned 10,065,306 shares of the Company's common stock, which represented 36.56% of the Company's outstanding shares of common stock on that date, thereby making Defendant Qiang a majority shareholder. Given that the price per share of the Company's common stock at the close of trading on April 5, 2018 was $1.68, Defendant Liu owned approximately $16.9 million worth of Nova LifeStyle stock.

49.    The Company's 2018 Proxy Statement stated the following about Defendant Qiang:

> ***Steven Qiang Liu*** has served as our Vice President since January 2, 2017. Mr. Liu is the chief executive officer and founder of St. Joyal, a company engaged in business investment and development that was founded in 2007. Mr. Liu has extensive experience in banking and business management, including acquisitions and investment oversight. He holds a Bachelor's Degree in Finance and Economics from Hunan College.

50.    Upon information and belief, Defendant Qiang is a citizen of the State of California.

**Defendant Patel**

---

[2] See Schedule 14A filed with the SEC on April 5, 2016.
[3] See Annual Report on Form 10-K filed by the Company with the SEC on March 29, 2018.

Verified Shareholder Derivative Complaint

51.     Defendant Umesh Patel ("Patel") has served as a Company director since October 2016. He also serves as a member of the Compensation Committee, Audit Committee, and Nominating and Corporate Governance Committee. According to the 2018 Proxy Statement, as of April 5, 2018, Defendant Patel beneficially owned 75,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2018 was $1.68, Defendant Patel owned approximately $126,000 worth of Nova LifeStyle stock.

52.     For the fiscal year ended December 31, 2017, Defendant Patel received $100,294 in compensation from the Company. This included $26,143 in fees earned or cash paid, $20,000 in stock awards, and 54,151 in option awards.

53.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Patel made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| November 1, 2017 | 5,001 | $    1.56 | $      7,801 |
| November 13, 2017 | 9,040 | $    2.56 | $    23,142 |

Thus, in total, before the fraud was exposed, he sold 14,041 Company shares on inside information, for which he received approximately $30,943. His insider sales made with knowledge of material non-public information before the material misstatements and

omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

54.     The Company's 2018 Proxy Statement stated the following about Defendant Patel:

> **Umesh Patel** was appointed a member of the Board on October 7, 2016. Since December 2009, Mr. Patel has served as a managing partner of DviBri LLC, a California-based consulting company providing services to private companies interested in conducting initial public offerings, along with other associated securities and investment services.  Since March 2013, Mr. Patel has also been a consultant and coordinator for Eos-Petro Inc., an international and domestic petroleum exploration and production company based in Southern California. Mr. Patel has also served as a director and the chief executive officer of Fuse Enterprises Inc., a company exploring opportunities in the mining industry, since February 2017. Mr. Patel received his Bachelor of Commerce degree specializing in audits and accounts, and an Associate degree in hotel management and catering from Maharaja Sayaji Rao University in Baroda, India in 1978.  The Board believes that Mr. Patel is well qualified to serve as a member of the Board due to his extensive regulatory and investment experience.

55.     Upon information and belief, Defendant Patel is a citizen of the State of California.

**Defendant Su**

56.     Defendant Min Su ("Su") has served as a Company director since August 2017 and as the Corporate Secretary since November 2016. According to the 2018 Proxy Statement, as of April 5, 2018, Defendant Su beneficially owned 80,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2018 was $1.68, Defendant Su owned

approximately $134,400 worth of Nova LifeStyle stock.

57.    For the fiscal year ended December 31, 2017, Defendant Su received

$126,614 in compensation from the Company. This included $70,000 in salary, $36,000

in stock awards, and $20,614 in option awards.

58.    The Company's 2018 Proxy Statement stated the following about Defendant

Su:

> **Min Su** was appointed as a member of our Board on August 22, 2017, and has served as the Company's Corporate Secretary since November, 2016. From 2012 to November, 2016, Ms. Su served as the accounts payable coordinator of Diamond Bar Outdoors Inc., the wholly-owned subsidiary of the Company, and concurrently as our executive secretary. Ms. Su received her Bachelor's Degree in E-Commerce Business from California State Polytechnic University, Pomona in 2005.  Ms. Su has been selected as a nominee for director due to her extensive experience and knowledge, and participation in the company's operations since 2012.

59.    Upon information and belief, Defendant Su is a citizen of the State of

California.

**Defendant Wong**

60.    Defendant Ya Ming Wong ("Wong") served as the Company's CEO and as

a director from June 2011 until his resignation in October 2016. According to the

Company's Schedule 14A filed with the SEC on April 5, 2016 (the "2016 Proxy

Statement"), as of March 21, 2016, Defendant Wong beneficially owned 4,925,403[4]

---

[4] These stocks included (1) 4,898,903 of the shares represented common stock held of record by Mr. Wong as a former co-owner of Nova Holdings, the former majority shareholder of Nova Furniture, and party to a Share Exchange Agreement, over which he had sole voting and dispositive power, (2) immediately-exercisable warrants to purchase 1,500 shares of Company common stock, and (3) 25,000 restricted shares that vested within 60 days of March 21, 2016.

shares of the Company's common stock, which represented 20.4% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on March 21, 2016 was $1.20, Defendant Wong owned approximately $5.9 million worth of Nova LifeStyle stock.

61.    For the fiscal year ended December 31, 2016, Defendant Wong received $190,000 in compensation from the Company. This included $100,000 in salary and $90,000 in stock awards.

62.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Wong made the following sale of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| December 28, 2016 | 4,973,903 | $   2.11 | $   10,494,935 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

63.    The Company's 2016 Proxy Statement stated the following about Defendant Wong:

**Ya Ming Wong** was appointed our Chief Executive Officer on June 30, 2011 and a Member of our Board on June 30, 2011. Mr. Wong was one of the two founders of Nova Dongguan, our wholly owned subsidiary, and has served as its Chief Executive Officer since its inception in 2003. Mr. Wong has over 20 years of experience in the furniture industry. Mr. Wong has been appointed the vice-chairman of the Dongguan City Association of Enterprises with Foreign Investment (DGAEFI) since December 2008, the

vice-chairman of the Dongguan Furniture Association (DGFA) since April 2003, and the director of The International Furniture and Decoration (Hong Kong) Association since January 2003. From 1991 to 2003, Mr. Wong served as the Chief Executive Officer of Navy Blue Inc., a Macao-based furniture company with manufacturing facilities in Dongguan, China. Prior to that time, from 1988 to 1991, Mr. Wong worked for C&E German Furniture Ltd., a Hong Kong-based furniture company with manufacturing facilities in Dongguan, China, as the design and production manager. Mr. Wong graduated from Hong Kong Tang Shiu Kin Victoria Technical School in 1988. Mr. Wong is the brother of Ah Wan Wong, our Vice President of Marketing. Mr. Wong brings extensive knowledge about business strategy and product development in the furniture industry in China and international markets and of our operations and long-term strategy to the Board. The Board believes that Mr. Wong's vision, leadership and extensive knowledge about us and the furniture industry is essential to our future growth.  Mr. Wong has been selected as a nominee for director because he is our Chief Executive Officer and has extensive knowledge of all facets of our Company and extensive experience in all aspects of our industry.

64.    Upon information and belief, Defendant Wong is a citizen of the People's Republic of China.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

65.    By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of Nova LifeStyle and because of their ability to control the business and corporate affairs of Nova LifeStyle, the Individual Defendants owed Nova LifeStyle and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Nova LifeStyle in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Nova LifeStyle and its shareholders so as to benefit all shareholders equally.

66.     Each controlling shareholder, director and officer of the Company owes to Nova LifeStyle and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

67.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors and/or officers of Nova LifeStyle, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

68.     To discharge their duties, the controlling shareholder, the officers and directors of Nova LifeStyle were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

69.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Nova LifeStyle, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors

of the Company has been ratified by the remaining Individual Defendants who collectively comprised Nova LifeStyle's Board at all relevant times.

70.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ-GM, the Individual Defendants, including Defendant Qiang as a controlling shareholder, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

71.     To discharge their duties, the officers and directors of Nova LifeStyle were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Nova LifeStyle were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, California, and the United States, and pursuant to Nova LifeStyle's own Code of Business Conduct and Ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Nova LifeStyle conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Nova LifeStyle and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Nova LifeStyle's operations would comply with all applicable laws and Nova LifeStyle's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

72.     Each of the Individual Defendants further owed to Nova LifeStyle and the shareholders the duty of loyalty requiring that each favor Nova LifeStyle's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

73.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Nova LifeStyle and were at all times acting within the course and scope of such agency.

74.     Because of their advisory, executive, managerial, and directorial, and controlling shareholder positions with Nova LifeStyle, each of the Individual Defendants had access to adverse, non-public information about the Company.

75.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Nova LifeStyle.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

76.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

77.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

78.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Nova LifeStyle, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

79.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

80.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Nova LifeStyle and was at all times acting within the course and scope of such agency.

## NOVA LIFESTYLE'S CODE OF CONDUCT

81.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct"), states that, "it sets out basic principles to guide all employees of Nova LifeStyle Inc. (the "Company") and all of our officers, directors and employees. All of our officers, directors and employees must conduct themselves accordingly and seek to avoid even the appearance of improper behavior. The code should also be provided to and followed by the Company's agents and representatives, including consultants."

82.     The Code of Conduct provides that insider trading is unethical and illegal, stating in relevant part:

> Employees who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of our business. All non-public information

about the Company should be considered confidential information. To use non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical but also illegal.

83.     The Code of Conduct contains a section relating to the Company's policies on competition and fair dealing which states in relevant part, "[e]ach officer, director and employee should respect the rights of and deal fairly with the Company's customers, suppliers, competitors and employees. No employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other intentional unfair-dealing practice . . ."

84.     The Code of Conduct outlines the Company's disclosure obligations and stresses the importance of the Company's full compliance with relevant rules and regulations:

> The Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules. Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel. Each director, officer and employee who is involved in the Company's disclosure process must: (a) be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and (b) take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

85.     The Code of Conduct also provides a section on record-keeping which requires honest and accurate reporting of, *inter alia*, financial statements, Company books, and records:

> The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions. For example, only the true and actual number of hours worked should be reported. Many employees regularly use business expense accounts, which must be documented and recorded accurately. If you are not sure whether a certain expense is legitimate, ask your supervisor or the Company's controller or chief financial officer. All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform to both applicable legal requirements and to the Company's systems of accounting and internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable laws or regulations. Business records and communications often become public, and we should avoid exaggeration, derogatory remarks, guesswork or inappropriate characterizations of people and companies that can be misunderstood. This applies equally to e-mail, internal memos and formal reports. Records should always be retained or destroyed according to the Company's record retention policies. In accordance with these policies, in the event of litigation or governmental investigation please consultant your supervisor.

86.     The Code of Conduct also contains a sections pertaining to reporting illegal or unethical behavior and outlines the Company's procedures relating to compliance with the Code of Conduct. Specifically, the Code of Conduct states that, "[a]ny employee may submit a good faith concern regarding questionable accounting or auditing matters without fear of dismissal or retaliation of any kind." Furthermore, the Company details certain procedures for reporting violations of the Code of Conduct stating in relevant part:

We must all work to ensure prompt and consistent action against violations of this Code. However, in some situations, it is difficult to know if a violation has occurred. Since we cannot anticipate every situation that may arise, it is important that we have a way to approach a new question or problem. These are steps to keep in mind: Make sure you have all the facts. In order to reach the rights solutions, we must be as fully informed as possible.

Ask yourself, what specifically am I being asked to do – does it seem unethical or improper? This will enable you to focus on the specific question you are faced with, and the alternatives you have. Use your judgment and common sense; if something seems unethical or improper, it probably is. Clarify your responsibility and role. In most situations, there is shared responsibility. Are your colleagues informed? It may help to get others involved and discuss the problem.

Discuss the problem with your supervisor. This is the basic guidance for all situations. In many cases, your supervisor will be more knowledgeable about the question, and will appreciate being brought into the decision-making process. Keep in mind that it is your supervisor's responsibility to help solve problems.

If your supervisor does not or cannot remedy the situation, or you are uncomfortable bringing the problem to the attention of your supervisor, bring the issue to the attention of the human resources supervisor, or to an officer of the Company. Actions prohibited by this code involving directors or executive officers must be reported to the Audit Committee of the Board of Directors.

After receiving a report of an alleged prohibited action, the Audit Committee, the relevant supervisor or the applicable officer of the Company must promptly take all appropriate actions necessary to investigate, and all directors, officers and employees are expected to cooperate in any internal investigation of misconduct. Upon determination that there has been a violation of this Code, the Company will take such preventative or disciplinary action as it deems appropriate.

You may report ethical violations in confidence and without fear of retaliation. If your situation requires that your identity be kept secret, your anonymity will be protected. The Company does not permit retaliation of any kind for good faith reports of ethical violations.

Always ask first – act later. If you are unsure of what to do in any situation, seek guidance before your act. Employees must conduct themselves accordingly and seek to avoid even the appearance of improper behavior. The code should also be provided to and followed by the Company's agents and representatives, including consultants.

87.     The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, and failing to report the same.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

88.     Nova LifeStyle is a U.S. based holding company which specializes in the design, production, and distribution of modern furniture. The Company's products are manufactured in the United States and Asia, and are advertised worldwide through online platforms and Company brands such as Diamond Sofa, Bright Swallow, and Colorful World. Nova Lifestyle's targeted customers are middle and upper-middle class consumers.

89.     The Company focuses on urban style and contemporary furniture designs. In addition to marketing its products directly to consumers, Nova Lifestyle also distributes its products to furniture companies and conducts business with other commercial entities situated in various countries, including China.

Verified Shareholder Derivative Complaint

90.     Starting from December 3, 2015, the Company issued multiple statements through SEC filings and press releases promoting a strategic alliance with a purported China-based company, Shanxi Wanqing Senior Care Service Group. Nova Lifestyle claimed it would be the exclusive furniture supplier for the Shanxi Project, which supposedly would cost hundreds of millions of dollars. The Company emphasized the growth and profitability the alliance would have on the Nova Lifestyle, and reported high levels of incoming sales from its customer Shanxi Wanqing, and other companies in its annual reports for 2016, and 2017.

**False and Misleading Statements**

*December 3, 2015 Press Release*

91.     On December 3, 2015, Nova Lifestyle issued a press release announcing that the Company had entered into an exclusive agreement with a "Leading Chinese Senior Care Center." The Company referred to the agreement as a "strategic alliance" with Shanxi Wanqing, which the Company described as a "a senior care service, senior care home and hotel development company." The Company stated through the alliance, Nova Lifestyle would "operate as the lead designer and manufacturer for all furnishings in the complex." The Company added that "[c]onstruction at the property has already commenced, which consists of individual homes, and the rest of the project will continue throughout 2016."

92.     The Company touted that it would be the "exclusive supplier for furniture design and manufacturing" for the Shanxi Wanqing Project. According to the Company's

press release, Shanxi Wanqing planned to invest an aggregate of $460 million dollars, or

"a total amount of 3.0 billion RMB . . . to build a major senior care center in Luoyang,

Henan province in China, and Nova LifeStyle will operate as the lead designer and

manufacturer for all furnishings in the complex." The press release further detailed that

"Shanxi Wanqing [would be] managing the project in conjunction with Luoyang Glass

Company Limited ("Luoyang Glass"), a well-regarded, publicly traded state-owned

enterprise that listed in both Shanghai and Hong Kong Exchange that manufactures and

sells sheet glass in over 80 countries throughout the world."

93.     The press release detailed the Shanxi Wanqing Project, stating that:

> The center will operate as a modern, state-of-the-art senior care hub in the
> fifth largest provincial economy of China, comprising of housing,
> entertainment, and medical facilities spread over 329.5 acres. Construction
> at the property has already commenced, which consists of individual homes,
> and the rest of the project will continue throughout 2016. The companies
> will also collaborate on marketing initiatives, customer service, and product
> promotion in China in the coming year. Nova LifeStyle is the first American
> Brand furnishing solution provider to be included on a construction project
> of this scale in China.

94.     In addition, the press release contained a "Management Commentary"

section, where Defendant Wong and the CEO of Shanxi Wanqing, Shengming Wu,

provided further comment:

> Mr. [Ya Ming][5] Jeffrey Wong, CEO of Nova LifeStyle, stated, "We are very
> pleased to sign an exclusive agreement to partner with Shanxi Wanqing and
> work with a well-regarded company such as Luoyang Glass, and support
> their plans for a modernized health care center in China. Partnerships with

---

[5] The Company's SEC filings during the Relevant Period referred to Nova Lifestyle's former CEO by the name
Ya Ming Wong or Ya Ming (Jeffrey) Wong.

well-capitalized companies such as Shanxi Wanqing and Luoyang Glass are critical to increase our exposure in new markets, such as health care, and generate significant long-term revenue opportunities for the Company.

With our ability to secure such agreements, we can better align ourselves with the type of large-scale projects that will re-shape modern China in the decades to come."

Ms. Shengming Wu, CEO of Shanxi Wanqing, commented, "We are pleased to partner with Nova LifeStyle, as we believe that both companies share the same vision of providing quality lifestyle solutions for China's elderly. According to the China Research Center on Aging, nearly 15% of the country's population, over 200 million people, are 60 or older and the Chinese government remains at the forefront of modernizing health care options within China. We look forward to collaborating with Nova LifeStyle in the years to come."

### April 5, 2016 Proxy Statement

95.     The Company filed its 2016 Proxy Statement with the SEC on April 5, 2016. Defendants Lam, Ho, Liu, and Wong solicited the 2016 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[6]

96.     The 2016 Proxy Statement stated, regarding the Company's Code of Conduct, that:

Our Board has adopted a Code of Business Conduct and Ethics, which applies to all of our directors, officers and employees, that we believe is reasonably designed to deter wrongdoing and promote honest and ethical conduct; provide full, fair, accurate, timely and understandable disclosure in public reports; comply with applicable laws; ensure prompt internal reporting of Code violations; and provide accountability for adherence to the

---

[6] Plaintiff's allegations with respect to the misleading statements in the 2016 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Code of Business Conduct and Ethics. The Code of Business Conduct and Ethics also includes an insider trading policy.

97.     The 2016 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

98.     The Individual Defendants also caused the 2016 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to: "(i) attract, motivate and retain key executives who are critical to our success, (ii) align the interests of our executives with stockholder value and our financial performance and (iii) achieve a balanced package that would attract and retain highly qualified senior officers and appropriately reflect each such officer's individual performance and contributions" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

99.     The 2016 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company exaggerated the truth and benefits of the supposed Shanxi Wanginq Project; (2) the Company reported inflated sales associated with Shanxi Wanginq and other companies in 2016, and; 3) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and

prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### *April 14, 2017 10-K*

100.    On April 14, 2017, the Company filed with the SEC its annual report for the fiscal year ended December 31, 2016 on a Form 10-K (the "2016 10-K"), which was signed by Individual Defendants Lam, Ho, La, Liu, and Patel.

101.    The 2016 10-K described the Company's target customers in the U.S. and in international markets and stated that the Company's largest customers that year were Shanxi Wanqing and a furniture company named Actona Company A/S. Specifically, the 2016 10-K stated:

**Customers**

Our target end customer is the middle and upper middle-income consumer of residential furniture. In the U.S. and international markets, our sales principally are to furniture distributors and retailers who in turn offer our products under their own brands or under our Diamond Sofa brand. Our largest customers in 2016 were Shanxi Wanqing Senior Care Service, Group and Actona Company A/S, a global furniture distributor, which accounted for 10.8% and 9.7% of our total sales in 2016, respectively. Our two largest customers in 2015 were Actona Company A/S and Encore Sofa Inc., which in total accounted for 11.8% of our sales in 2015. No other individual customer accounted for greater than 10% of our sales in 2016 or 2015. We plan to increase direct sales to retailers and chain stores worldwide as we continue to diversify our customer base from global furniture distributors.

102.    Attached to the 2016 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Lam and Ho, attesting to the accuracy of the 2016 10-K.

*April 20, 2017 Proxy Statement*

103.     The Company filed its 2017 Proxy Statement with the SEC on April 20, 2017. Defendants Lam, Ho, La, Liu, and Patel solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[7]

104.     The 2017 Proxy Statement stated, regarding the Company's Code of Conduct, that:

> Our Board has adopted a Code of Business Conduct and Ethics, which applies to all of our directors, officers and employees, that we believe is reasonably designed to deter wrongdoing and promote honest and ethical conduct; provide full, fair, accurate, timely and understandable disclosure in public reports; comply with applicable laws; ensure prompt internal reporting of Code violations; and provide accountability for adherence to the Code of Business Conduct and Ethics. The Code of Business Conduct and Ethics also includes an insider trading policy.

105.     The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by three of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

106.     The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ

---

[7] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

"pay-for-performance" elements, including equity awards designed to: "(i) attract, motivate and retain key executives who are critical to our success, (ii) align the interests of our executives with stockholder value and our financial performance and (iii) achieve a balanced package that would attract and retain highly qualified senior officers and appropriately reflect each such officer's individual performance and contributions" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

107.   The 2017 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company exaggerated the truth and benefits of the supposed Shanxi Wanginq Project; (2) the Company reported inflated sales associated with Shanxi Wanginq and other companies in 2016 and 2017, and; (3) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

**March 29, 2018 10-K**

108.   On March 29, 2018, the Company filed with the SEC its annual report for the fiscal year ended December 31, 2017 on a Form 10-K (the "2017 10-K"), which was signed by Individual Defendants Lam, Chuang, La, Liu, Patel, and Su.

109.   The 2017 10-K listed Shanxi Wanqing Senior Care Service, Group and Home Centre LLC as one its largest customers for the year, along with Merlino Lewis LLP, stating in relevant part:

**Customers**

Our target end customer is the middle and upper middle-income consumer of residential furniture. In the U.S. and international markets, our sales principally are to furniture distributors and retailers who in turn offer our products under their own brands or under our Diamond Sofa brand. Our largest customers in 2017 were Merlino Lewis LLP, Shanxi Wanqing Senior Care Service, Group and Home Centre LLC, which accounted for 24.3%, 13.7% and 11.5% of our total sales in 2017, respectively. Our two largest customers in 2016 were Shanxi Wanqing Senior Care Service, Group and Actona Company A/S, a global furniture distributor, which accounted for 10.8% and 9.7% of our total sales in 2016, respectively. No other individual customer accounted for greater than 10% of our sales in 2017 or 2016. We plan to increase direct sales to retailers and chain stores worldwide as we continue to diversify our customer base from global furniture distributors.

110.    Attached to the 2017 10-K were SOX certifications signed by Defendants Lam and Chuang, attesting to the accuracy of the 2017 10-K.

***April 9, 2018 Proxy Statement***

111.    The Company filed its 2018 Proxy Statement with the SEC on April 9, 2018. Defendants Lam, La, Liu, Patel, and Su solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[8]

112.    The 2018 Proxy Statement stated, regarding the Company's Code of Conduct, that:

Our Board has adopted a Code of Business Conduct and Ethics, which applies to all of our directors, officers and employees, that we believe is

---

[8] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

reasonably designed to deter wrongdoing and promote honest and ethical conduct; provide full, fair, accurate, timely and understandable disclosure in public reports; comply with applicable laws; ensure prompt internal reporting of Code violations; and provide accountability for adherence to the Code of Business Conduct and Ethics. The Code of Business Conduct and Ethics also includes an insider trading policy.

113.   The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by one of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

114.   The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to: "(i) attract, motivate and retain key executives who are critical to our success, (ii) align the interests of our executives with stockholder value and our financial performance and (iii) achieve a balanced package that would attract and retain highly qualified senior officers and appropriately reflect each such officer's individual performance and contributions" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

115.   The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company exaggerated the truth and benefits of the supposed Shanxi Wanginq Project; (2) the Company reported inflated sales associated with Shanxi Wanginq and other

companies in 2016 and 2017, and; (3) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

116.    The statements in ¶¶ 91-94, 100-102, and 108-110 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: that: (1) the Company exaggerated the truth and  benefits of the supposed Shanxi Wanginq Project; (2) the Company reported inflated sales associated with Shanxi Wanginq and other companies in 2016 and 2017, and; (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## **The Truth Emerges**

117.    On December 21, 2018, a report by Andri Capital published on Seeking Alpha revealed that the Company's 2016 and 2017 reported revenues were inflated due to sale bookings made by Nova LifeStyle of over $50 million to companies that were dissolved or did not exist (the "Report"). The Report's summary noted that "serious irregularities" were found in the Company's financial statements which suggested fictitious financial reporting dating back to 2011. The Report continued by stating that bookings were made to Merlino Lewis LLP in 2017, though the company had dissolved in 2013:

We have found multiple evidence of serious irregularities that suggest Nova LifeStyle has reported **fictitious financials** since 2011 - inflating sales for the years 2016 and 2017, totalling approximately $50.5 million. And possibly over $100 million when accounting for Actona Company A/S since 2011 and High Fashion Home in 2015.

118.   Furthermore, the Report stated that could not find information on Shanxi Wanqing and the Company may have created a shell company in an attempt to deceive the investing public. The Report stated that the Company attributed around $24.6 million worth of sales to Shanxi Wanqing in 2016 and 2017, and that purported customers of the Company such as Actona Company A/S did not recognize doing business with Nova LifeStyles. Specifically, the Report's Summary stated:

The Company has done this by booking sales to both a dissolved company (Merlino Lewis LLP) and a nonexistent one (Shanxi Wanqing Senior Care Service, Group) (possibly creating a shell company to deceive investors).

Merlino Lewis LLP was dissolved in 2013, but in 2017 NVFY recorded sales to the company of approximately $25.9 million.

We found no information about Shanxi Wanqing Senior Care Service, Group in the Chinese State Administration registry. Its website is nonexistent and we find the press release issued by Nova LifeStyle on December 3, 2015 hard to believe – asserting doubtful statements by assuming a connection with a publicly-listed, state-owned glass manufacturer (Luoyang Glass) and a known personality in the elderly-care and nursing home sector. NVFY recorded sales to Shanxi Wanqing Senior Care Service, Group of approximately $10 million in 2016 and $14.6 million in 2017, totalling $24.6 million.

We contacted other customers of Nova LifeStyle to verify their relations with the Company. Of the ones that have responded the following do not seem to recognize doing business with NVFY: Actona Company A/S (possibly accounting for sales of around $55 million since 2011), High Fashion Home (sales around $7 million in 2015). Totalling over $60 million.

119.    The Report continued, noting additional concerns with Nova LifeStyle's operations:

Other concerns, such as high levels of accounts receivable, reverse merger listing, a significant shareholder, questionable auditors, and more, raise red flags that further shine a light on the questionable practices of Nova LifeStyle.

We contacted Nova LifeStyle regarding all these irregularities, but did not receive a response. Updates will be published here if NVFY contacts us.

We believe this will result in a delisting and share-price drop to near zero.

We reverse our recommendation to **Strong Sell**.

120.    The Report detailed suspicious activity carried on by the Company particularly with respect to its recorded sales with Merlino Lewis LLP and Shanxi Wanqing in 2016 and 2017:

**Suspicious Activity: Fictitious/Inflated Sales**

In its 2017 annual report Nova LifeStyle stated:

*"Our largest customers in 2017 were Merlino Lewis LLP, Shanxi Wanqing Senior Care Service, Group and Home Centre LLC, which accounted for 24.3%, 13.7% and 11.5% of our total sales in 2017, respectively. Our two largest customers in 2016 were Shanxi Wanqing Senior Care Service, Group and Actona Company A/S, a global furniture distributor, which accounted for 10.8% and 9.7% of our total sales in 2016, respectively."*

121.    The Report revealed "irregularities" upon investigating these statements. Specifically with respect to Merlino Lewis LLP, the Report indicated that the company had been dissolved since 2013, highlighting the peculiarity of the Company's supposed $25.9 million in sales with Merlino Lewis LLP four years later in 2017:

**Merlino Lewis LLP**

This company appears to have been dissolved in 2013 (*Source: The Gazette - UK's official public record of statutory notices.(A simple Google Search for "Merlino Lewis LLP" also quickly reveals the above fact.)*. Therefore, it couldn't possibly have been a customer of Nova LifeStyle in 2017 - four years later after being liquidated and closed down.

This company supposedly accounted for 24.3% of NVFY's total sales in 2017, or approximately $25.9 million (24.3% of $106,494,132 total sales). (Source: Annual report 2017) We contacted Nova Lifestyle regarding the appearance that Merlino-Lewis LLP was dissolved during periods when Nova Lifestyle claimed sales to them, but did not receive a response.

122. Turning its attention to Shanxi Wanqing, the Report quoted Nova LifeStyle's press release proclaiming the multi-million dollar Shanxi Wanqing Project and the Company's strategic positioning:

**Shanxi Wanqing Senior Care Service, Group**
On December 3, 2015 NVFY announced that it had signed a strategic alliance agreement with Shanxi Wanqing Senior Care Service, Group to operate as its exclusive supplier for furniture design and manufacturing.According to the press release:

*"Shanxi Wanqing plans to invest a total amount of 3.0 billion RMB (USD $460 Million) to build a major senior care center in Luoyang, Henan province in China, and Nova LifeStyle will operate as the lead designer and manufacturer for all furnishings in the complex."*

123. The Report detailed investigative findings on Shanxi Wanqing and the supposed Shanxi Wanqing Project. The Report found no functioning website for the company, but it did find a company listed by the same name which seemed to be a shell company registered in Nevada on August 26, 2016—almost an entire year after the press release. The Report stated in relevant part:

We have performed a search for this company in China with no results, i.e. no company by this name (or a similar one, in English or Chinese) seems to exist. Its supposed website is also not functional (wanqing-group.com). (Source: State Administration for Industry and Commerce of the People's Republic of China)

However, we still found a company by this exact name incorporated in Nevada, USA. But it was registered on August 26, 2016 - nearly one year later after the announcement – and looks like an empty shell company, with the same person (Benedict Lo) serving as president, director, treasurer and secretary, and the business license likely expired on August 31, 2017. (Source)

One must ask, why would a private Chinese-based company, operating senior care centers in China, be incorporated in Nevada, USA? Also, the press release states that "construction at the property has already commenced", so the company must have existed before the announcement was made in 2015. However, the (Nevada-based) company was incorporated in 2016 - a year later, and making no sense at all.

124.   In addition to investigating the supposed Shanxi Wanqing company, the Report also provided findings on Ms. Shengming Wu ("Ms. Wu"), whom the Company's press release had identified as the CEO of Shanxi Wanqing. The Report found support for Ms. Wu's involvement with nursing homes but were unable to find any connection to the advertised Shanxi Wanqing Project. According to the Report, Ms. Wu has never been quoted as the CEO of Shanxi Wanqing. The Report uncovered recent interviews and statements made by Ms. Wu indicating that it was her dream to build a nursing home, but all information found pointed to Ms. Wu managing a small elderly care home in Xi'An and was quoted in November 2015 that through the management position, she would work towards her goal of running a nursing home in the future. The Report outlined their findings on Ms. Wu as follows:

We also looked into the supposed CEO of the company, Ms. Shengming Wu. While it's true that she's involved with nursing homes and various other activities (source), we did not once find any interview or coverage about her mentioning the building of a major senior care center in Luoyang, Henan. She is never quoted as the "CEO of Shanxi Wanqing". Also, she lives in Xi'An which is the capital of Shaanxi (note two *a*'s), so one would expect her company name to rather be a reference to Sh*aa*nxi instead of another neighboring Chinese province called Sh*a*nxi (her living there also goes to show that the Nevada-incorporated company is highly suspicious). Still we were easily able to find information about her other companies, both in coverage about her and in the Chinese registry (e.g. Yangling Hongyang Fruit Industry Technology Development Co., Ltd., or Wu Mama Xing Nong Technology Development Co., Ltd. (source)). Due to the fact that Ms. Shengming Wu is actually involved with senior care the matter becomes a little more complicated and cumbersome, because it seemingly lends truth to NVFY's announcement.

Seeing how big the senior care center was supposed to be, and knowing that Ms. Shengming Wu's mission revolves around nursing homes and elderly care, this should have been her crown jewel - yet nothing is ever mentioned of this project, not in 2015, 2016 or any year later. We only found information about her contracting land in the small district of Yangling, near Xi'An (not in Luoyang, Henan) to build an old-age apartment there within two to three years for 60 people - hardly a $460 million project (this was published just one month before NVFY's press release). There was also a video interview earlier this year (2018) where she at one point says that it is her dream to "build a model nursing home" (thereby surely implying that she has not been involved with building anything of such scale as the supposed major senior care center that was so vividly described in NVFY's press release).

The truth of the matter is that in 2010 Ms. Shengming Wu was actually approached by an owner of an elderly-care home in Xi'An to become its *managing director*, not a CEO of a "Senior Care Service Group". And according to all our sources, and as is generally described below, this is where she has been ever since. In other words, Ms. Shengming Wu simply manages a small elderly care home in Xi'An.

*"In 2010, the owner of Yuhua Senior Apartment learned about Wu Shengming from TV and online, and invited her to manage this old apartment. At that time, she also operated her own company in Yangling*

Verified Shareholder Derivative Complaint

*Agricultural Science City. After being invited, she handed over the company to others and went to Xi'an alone. [At] Yuhua Senior Apartment in the intersection of Xi'an North Second Ring Road and Mingguang Road, the reporter saw Wu Shengming, who is known as "Mu Wu". She is the manager of this elderly apartment. Wu Shengming does not live in an elderly apartment, but rents a unit in the neighborhood opposite the apartment. Room, for one person living alone. "I go to the office at 7:20 every morning and work until 6 or 7 in the evening." "In the past few years, I have been with the old people most of the time, so I can accumulate more management experience." Wu Shengming told reporters that the reason why she [took on] the management of this apartment is that she wants to run a nursing home in the future."* (Source, Note: This was published in November, 2015- right before NVFY's press release - and clearly indicates that she is most certainly not a CEO of a company already building a $460 million nursing home complex in another part of the country.)

125.    In December 2016, she stated in an interview that she was currently involved in "grassroots work" in a small nursing home obtaining experience so that she could open her own nursing home in the future:

And further, in an interview published one year later on December 26, 2016 she is quoted as "the manager of the nursing home". She also states clearly that she has entrusted others to run her own companies while she manages a nursing home of 80 elderly people in Xi'An (Yuhua senior apartment home) and:

*"I am just earning a salary. I still have a distance from a charity nursing home. It is estimated that it will take about three years." She said that the reason why she took over this small-scale nursing home is that she wants to accumulate experience. "I will open my own nursing home in the future."*

*"What I am doing now is mainly grassroots work." This nursing home is very small and the things are fine and complicated. She can only manage with the mentality of learning and spends most of her time in contact with the elderly."*

*[In large pension apartment centers] the top leaders only need to take care of the overall situation. But for small pension apartments, which plug is broken today, which tap tomorrow? Broken [items], security issues,*

*electricity problems [...], I have to personally help."*

126.    The Report distinguished the information gathered on Ms. Wu with the representations made by the Company.

> This is obviously a far cry from being the CEO of a multimillion dollar senior-care and hotel-development company that at the time had supposedly already commenced construction of a massive $460 million major care center with housing, entertainment, and medical facilities in Luoyang, Henan while partnering with a large, state-owned entity. And note, the above statement and interview was published one year later after the announcement by Nova LifeStyle. That is, even a year after NVFY announced the project she held the title "manager of a small-scale nursing home" in Xi'An - clearly describing the daily activities of a caretaker in an elderly-care apartment building - and obviously with no mention of any involvement with major developments in Luoyang, Henan, or relations to the state-owned Luoyang Glass.

> So, at the time of Nova LifeStyle's press release Ms. Shengming Wu was managing a small apartment home for elderly in Xi'An, while dreaming of running her own nursing home in the future - not being the CEO of a large senior-care and hotel-development company already building a major care center in Luoyang, Henan in cooperation with a giant state-owned enterprise.

127.    The Report additionally stated that a search through Luoyang Glass's (the state-owned glass manufacturer mentioned in the Company's press release) did not reveal any relationship between Luoyang Glass and the Shanxi Project.

> In regards to the cooperation with the publicly-traded, state-owned glass manufacturer Luoyang Glass: We read through all the firm's quarterly and annual reports since 2014, and not once was anything mentioned about Shanxi Wanqing or a senior care center project. Multiple searches about any relations between this project and Luoyang Glass further revealed nothing. Considering the supposedly large scale of the project (3 billion RMB or $460 million), it is simply strange that not a single comment can be found about it anywhere outside of the press release by Nona LifeStyle.

128.    In sum, the Report reiterated the concerns found after investigating the recorded sales and statements issued by Nova LifeStyle, noting that the information revealed that Shanxi Wanqing was either "a significant irregularity" or the Company intentionally misrepresented and/or misstated the truth:

> All in all, we found no company registered in China by the name "Shanxi Wanqing Senior Care Service, Group", no evidence of any links to Luoyang Glass, and no affiliations with Ms. Shengming Wu (who at the time of the announcement was a managing director of a single elderly home, dreaming of running her own small nursing home in the future in Xi'An - not a CEO of a multimillion dollar senior-care and hotel-development company already constructing a gigantic complex in Luoyang, Henan).

> Based on the above, the statement by Nova LifeStyle has no support to be true. A few months before the press release shares of Luoyang Glass shot through the roof – going from 5 CNY in early 2014 to 45 CNY in October, 2015. The life story of Shengming Wu was also quite prominently featured in China. At the very least this Shanxi Wanqing Senior Care Service, Group is a significant irregularity, and in a worst-case scenario at most a complete fabrication or severe distortion of the truth.

> Shanxi Wanqing Senior Care Service, Group supposedly accounted for 13.7% of NVFY's total sales in 2017, or approximately $14.6 million (13.7% of $106,494,132 total sales), and 10.8% of total sales in 2016, or approximately $10 million (10.8% of $92,648,195 total sales). That's $24.6 million in total for 2016 and 2017. (Source: Annual report 2017)

> We contacted Nova Lifestyle regarding Shanxi Wanqing Senior Care Service, Group, but did not receive a response.

129.    When news of the Report reached the public, the Company's price per share dropped from a closing price of $0.77 on December 20, 2018 to a closing price of $0.46 on December 21, 2018, a decline of over 40%.

130.   On January 22, 2019, the Company filed a current report on Form 8-K with the SEC stating that Nova LifeStyle received written notice from the Nasdaq Stock Market on January 18, 2019 that the Company's shares no longer met the minimum bid price required for listing on Nasdaq and would therefore be delisted unless the Company regained compliance within 180 calendar days from the date of the notification.

## DAMAGES TO NOVA LIFESTYLE

131.   As a direct and proximate result of the Individual Defendants' conduct, Nova LifeStyle has lost and expended, and will lose and expend, many millions of dollars.

132.   Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its President and CEO, its former CEO, its CFO, and its former CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

133.   Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

134.   As a direct and proximate result of the Individual Defendants' conduct, Nova LifeStyle has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due

to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

135.   Plaintiff brings this action derivatively and for the benefit of Nova LifeStyle to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors and/or officers of Nova LifeStyle, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

136.   Nova LifeStyle is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

137.   Plaintiff is, and has continuously been at all relevant times, a shareholder of Nova LifeStyle. Plaintiff will adequately and fairly represent the interests of Nova LifeStyle in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

138.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

139.   A pre-suit demand on the Board of Nova LifeStyle is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following five Individual Defendants: Lam, La, Liu, Patel, and Su (collectively, the "Directors").

Verified Shareholder Derivative Complaint

Plaintiff needs only to allege demand futility as to three of the five Directors that were on the Board at the time this action was commenced.

140.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while two of them engaged in insider sales based on material non-public information, netting proceeds of over $178,442, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

141.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

142.    Additional reasons that demand on Defendant Lam is futile follow. Defendant Lam has served as the Company's President since June 2011 and as its CEO since October 2016. She also serves as Chairman of the Board. Thus, as the Company admits, she is a non-independent director. The Company provides Defendant Lam with

her principal occupation, and she receives handsome compensation, including $141,228 during the fiscal year ended December 31, 2017. Defendant Lam was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the 2016 and 2017 10-Ks, which she signed and signed SOX certifications for. As the Company's highest officer and as a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Her insider sales before the fraud was exposed, which yielded at least $147,499 in proceeds, demonstrate her motive in facilitating and participating in the fraud.

143.    Defendant Lam has also been the recipient of rental payments made to her by the Company for leasing a showroom in High Point, North Carolina since September 2011, and received $65,832 total under the lease agreement for 2016 and 2017. Moreover, Defendant Lam is a defendant in the Securities Class Action. For these reasons, too, Defendant Lam breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

144.    Additional reasons that demand on Defendant La is futile follow. Defendant La has served as a Company director since January 2017 and serves as a member of the Compensation Committee, Audit Committee, and Nominating and Corporate Governance

Committee. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant La signed, and thus personally made the false and misleading statements in, the 2016 and 2017 10-Ks. For these reasons, too, Defendant La breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145. Additional reasons that demand on Defendant Liu is futile follow. Defendant Liu has served as a Company director since May 2015 and serves as a member of the Compensation Committee, Audit Committee, and Nominating and Corporate Governance Committee. Defendant Liu receives handsome compensation, including $101,421 during the fiscal year ended December 31, 2017. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Liu signed, and thus personally made the false and misleading statements in, the 2016 and 2017 10-Ks. For these reasons, too, Defendant Liu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

146. Additional reasons that demand on Defendant Patel is futile follow. Defendant Patel has served as a Company director since October 2016 and serves as a member of the Compensation Committee, Audit Committee, and Nominating and Corporate Governance Committee. Defendant Patel receives handsome compensation, including $100,294 during the fiscal year ended December 31, 2017. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Patel signed, and thus personally made the false and misleading statements in, the 2016 and 2017 10-Ks. His insider sales before the fraud was exposed, which yielded at least $30,943 in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Patel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147. Additional reasons that demand on Defendant Su is futile follow. Defendant Su has served as a Company director since August 2017 and as the Company's Corporate Secretary since November 2016, and is thus a non-independent director. Defendant Su receives handsome compensation, including $126,614 during the fiscal year ended December 31, 2017. As a Company director she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements,

consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Su signed, and thus personally made the false and misleading statements in, the 2017 10-K. For these reasons, too, Defendant Su breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

148.   Additional reasons that demand on the Board is futile follow.

149.   As described above, two of the Directors on the Board directly engaged in insider trading, in violation of federal law. Defendants Lam and Patel collectively received proceeds of over $178,442 as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

150.   Demand in this case is excused because the Directors, all of whom are named as defendants in this action, are beholden to and controlled by Defendant Qiang, who controls the Company by virtue of his share ownership which provided him with approximately 36.56% of the total shareholder voting power as of April 5, 2018. These shareholdings provide Defendant Qiang with significant control over the continued employment of the Directors, especially Defendants Lam and Su, who are also executives of Nova LifeStyle. Defendants Liu and Patel are also beholden to Defendant Qiang because of the handsome compensation they receive as Directors. Thus, the Directors are

unable to evaluate a demand with disinterest or independence as a result of Defendant Qiang's control over them.

151.    Demand in this case is excused because the Directors control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendant Qiang is the owner of St. Joyal, which Nova LifeStyle has relied on and benefited from for a number of years as per the Agreement entered into in 2011. The Directors are unlikely to risk the Company's business by subjecting Defendant Qiang to a lawsuit based on the claims asserted herein. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

152.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

153.   Nova LifeStyle has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Nova LifeStyle any part of the damages Nova LifeStyle suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

154.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

155.   The acts complained of herein constitute violations of fiduciary duties owed by Nova LifeStyle officers and directors, and these acts are incapable of ratification.

156.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Nova LifeStyle. If there is a directors' and officers' liability insurance policy covering the Directors, it may

contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Nova LifeStyle, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

157.    If there is no directors' and officers' liability insurance, then the Directors will not cause Nova LifeStyle to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

158.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

159.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

160.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

161.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

162.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

163.   Under the direction and watch of the Directors, the 2016, 2017, and 2018 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the

Company exaggerated the truth and benefits of the supposed Shanxi Wanginq Project; (2) the Company reported inflated sales associated with Shanxi Wanginq and other companies in 2016 and 2017, and; (3) the Company failed to maintain internal controls.

164.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements including equity awards designed to "(i) attract, motivate and retain key executives who are critical to our success, (ii) align the interests of our executives with stockholder value and our financial performance and (iii) achieve a balanced package that would attract and retain highly qualified senior officers and appropriately reflect each such officer's individual performance and contributions" while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

165.    The Proxy Statements also made references to the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures, and not engage in insider trading. By engaging issuing false and misleading statements to the investing public and insider trading, the Individual Defendants violated the Code of Conduct. The Proxy Statements failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

166.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the  Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

167.   The false and misleading elements of the Proxy Statements led to the re-election of Defendants Lam, La, Liu, Patel, and Su, which allowed them to continue breaching their fiduciary duties to Nova LifeStyle.

168.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

169.   Plaintiff on behalf of Nova LifeStyle has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

170.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

171.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Nova LifeStyle's business and affairs.

172.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

173.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Nova LifeStyle.

174.     In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

175.     In further breach of their fiduciary duties owed to Nova LifeStyle, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company exaggerated the truth and benefits of the supposed Shanxi Wanginq Project; (2) the Company reported inflated sales associated with Shanxi Wanginq and other companies in 2016 and 2017, and; (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

176.     The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

177.    In breach of their fiduciary duties, ten of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

178.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

179.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken

appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

180. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

181. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Nova LifeStyle has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

182. Plaintiff on behalf of Nova LifeStyle has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

183. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Nova LifeStyle.

185. The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Nova LifeStyle that was tied to the performance or artificially

inflated valuation of Nova LifeStyle, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

186.   Plaintiff, as a shareholder and a representative of Nova LifeStyle, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

187.   Plaintiff on behalf of Nova LifeStyle has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

188.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

190.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

191.   Plaintiff on behalf of Nova LifeStyle has no adequate remedy at law.

## PRAYER FOR RELIEF

Verified Shareholder Derivative Complaint

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Nova LifeStyle, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Nova LifeStyle;

(c)     Determining and awarding to Nova LifeStyle the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Nova LifeStyle and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Nova LifeStyle and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Nova LifeStyle to nominate at least three candidates for election to the Board; and

66

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Nova LifeStyle restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: March 8, 2019                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**
   /s Robert C. Moest
.
            Robert C. Moest, Of Counsel

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

VERIFICATION

I, Jie Yuan am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this __th day of March 2019.

3/8/2019

DocuSigned by:

*Jie Yuan*

2D151 6E452064A3...

Jie Yuan